**FILED**

October 11, 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY:  Christian Rodriguez

DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JULIAN REYES, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CITY OF AUSTIN, AUSTIN POLICE | § | Case No. 1:21-CV-00992-RP-SH |
| DEPARTMENT, TROY WISMAR, | § | |
| CHRISTOPHER CARLISLE, | § | |
| PATRICK WALSH, KYU SUK AN, | § | |
| SARAH FOSTER, GREG McCORMACK, | § | |
| and JOHN DOES, Individually and in | § | |
| their official capacities, | § | |
| Defendants. | § | |

**PLAINTIFF JULIAN REYES' OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

TO THE HONORABLE ROBERT PITMAN:

Plaintiff Julian Reyes objects to the Order and Report and Recommendation of the United States Magistrate Judge ("Report and Recommendation") filed September 19, 2024 (Doc. 56) and would respectfully show:

**I.     Introduction and summary.**

Mr. Reyes objects to the Magistrate Judge's Report and Recommendation because there are material issues of contested fact as to each of Mr. Reyes's claims.  Contrary to the Report and Recommendation's conclusions, the evidence is not undisputed that there was probable cause to arrest Mr. Reyes when he was filming police activity, and even if there was, there is summary judgment evidence supporting a reasonable inference that those arrests were in retaliation for his exercise of his First Amendment right to record and criticize police conduct.  There is evidence that Mr. Reyes's arrests constitute an informal custom, pattern, and practice of the City of Austin to arrest him because of, and in retaliation for, his exercise of those rights.  Likewise, there is

summary judgment evidence supporting Mr. Reyes's claim that the City's seizure of his cameras and the recordings they contained violated his rights under the Privacy Protection Act of 1980, which precludes the seizure of journalists' work product and documentary materials except in very narrow circumstances not applicable here.

## II.    Case background.

### A.    Procedural history.

Plaintiff Julian Reyes, a citizen journalist, filed this lawsuit *pro se* against the City of Austin and several individuals because his repeated arrests while filming police activity violated his First Amendment rights.  Doc. 1.  The City moved to dismiss, Doc. 8, and the motion was referred to Magistrate Judge Susan Hightower.  Doc. 9.

Judge Hightower recommended that Mr. Reyes's claims against the individuals be dismissed based on qualified immunity but concluded that Mr. Reyes had stated a claim against the City.  Doc. 10.  Judge Hightower noted that Mr. Reyes identified "two separate arrests and alleges that 'about 10 [or] so' additional arrests occurred under similar circumstances."  Doc. 10 at 6.  Based on those allegations, she concluded that Mr. Reyes had "made specific factual allegations allowing a reasonable inference that the City had a policy, practice or custom of arresting individuals to prevent them from filming police activities," and that Mr. Reyes stated a plausible claim that the City's policy was the "moving force" behind the violation of his constitutional rights.  *Id*. at 8-10.  The City did not object to the report and recommendation, which was adopted.  Doc. 14.

After being granted appointed counsel, Doc. 19, Mr. Reyes filed a First Amended Complaint, alleging that Austin Police Department ("APD") officers have repeatedly and wrongfully arrested him while filming police interactions with unhoused people and others, and

that he has been repeatedly arrested and interfered with by APD officers while exercising his First Amendment rights. *Id*. at 2-3. He alleges that his arrests were without probable cause and/or were made in retaliation for his criticism of the police and to discourage him from further exercising his rights. *Id*. at 3. Mr. Reyes asserts causes of action under 42 U.S.C. § 1983 for violating his First and Fourteenth Amendment rights and under 42 U.S.C. § 2000aa, *et seq.*, for illegally seizing his journalist work product and documentary materials. *Id*. at 3-6.

The City did not move to dismiss Mr. Reyes's Amended Complaint. The parties exchanged documents in discovery, and Mr. Reyes deposed the City's 30(b)(6) witness and one of the officers who arrested Mr. Reyes. The City did not take Mr. Reyes's deposition.

**B.    The City's Motion for Summary Judgment and the Magistrate Judge's Report and Recommendation.**

The City moved for summary judgment on all of Mr. Reyes's claims. Doc. 44. As to Mr. Reyes's Section 1983 claims, the City argued that (1) his complaints of arrests before November 5, 2019 were barred by limitations; (2) he had no evidence that the City has a policy of arresting him for filming police; (3) the City's policy was not the moving force behind his arrests; (4) the fact that the charges against him in every single arrest were dismissed was irrelevant; and (5) his claim that he was singled out for arrest was unsubstantiated. *Id*. at 12-17.

As to Mr. Reyes's Privacy Protection Act claim, the City argued that (1) Mr. Reyes did not identify himself as a member of the press or provide "any evidence he had his cameras with him because he intended to record his activity and disseminate the material to the police;" (2) there was probable cause to arrest him; (3) there was probable cause to seize his cameras; and (4) APD sought a search warrant "before turning the cameras over to the Digital Forensics team" (but not before seizing them). Doc. 44. Mr. Reyes opposed the City's summary judgment on each point and filed numerous exhibits in support. Doc. 47-1, Exs. 1-22.

Without hearing, Magistrate Judge entered a Report and Recommendation.  Doc. 56.  In her Report and Recommendation, Judge Hightower first denied the City's motion to strike two of Mr. Reyes's exhibits and ruled that the City had waived any limitations defense.  Doc. 56 at 4-5, 7.  She recommends that Mr. Reyes's First Amendment claims be dismissed because "Reyes shows neither the absence of probable cause for any of his arrests or 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'"  Doc. 56 at 17 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 404, 407 (2019)).  She also concluded that Mr. Reyes proffered no summary judgment evidence "that the City had a policy, custom, or practice" of arresting him for filming police activity.  Doc. 56 at 17-20.  Finally, she concluded in a single sentence that Mr. Reyes "identifies no municipal policymaker" responsible for the City's policy and practice of arresting him, a ground for dismissal not raised by the City.  *Id*. at 20.  *See* Doc. 44 at 12-17.[1]

## III.    Mr. Reyes submitted substantial summary-judgment evidence showing a long-standing City practice of singling him out for exercising his First Amendment rights.

The Report and Recommendation ignores much of the summary judgment evidence Mr. Reyes submitted, all of which was admitted.  Respectfully, Mr. Reyes objects to the Report and Recommendation because it does not properly apply the Rule 56 standard for reviewing evidence.  In particular, the Report and Recommendation does not "view the summary judgment in the light most favorable to" Mr. Reyes, and it fails to "draw all reasonable inferences" from that

---

[1] The Report and Recommendation should not have recommended the grant of summary judgment on the ground that there was no evidence of a policymaker because the Court did not give the Mr. Reyes notice that it would consider this ground *sua sponte*.  *See* Fed. R. Civ. P. 56(f)(3) ("*After giving notice and a reasonable time to respond*, the court may: … consider summary judgment on its own a*fter identifying for the parties material facts that may not be genuinely in dispute*." (emphasis added)).  This Court should not grant summary judgment for the lack of evidence of a policymaker.

evidence in his favor "without making credibility determinations or weighing the evidence," as required.  *E.g.*, *Kost v. Cotto*, 458 F. Supp. 3d 571, 582 (W.D. Tex. 2020).

As noted below, the Report and Recommendation ignores evidence from APD's own files reflecting the City's knowledge that Mr. Reyes wears press credentials and is employed as a journalist for the *Challenger Street Newspaper*; that the City knows he films police conduct for publication and criticism; that the APD labelled Mr. Reyes ANTI-POLICE in the database that all officers use, because of his speech; and that an APD supervisor called him a "loon" and "turd" in an email to his officers, based on Mr. Reyes's criticism of APD's treatment of homelessness.  The Report and Recommendation fails to recognize clear evidence that the City and APD officers resent Mr. Reyes's vocal criticism of their conduct and fails to draw the reasonable inference from that evidence, and from the video evidence of his arrests, that the City has allowed, encouraged, and ratified a policy, demonstrated in practice and in writing, of singling him out for disparate treatment, including arrest and seizure, based on his First Amendment-protected activity.

Because the Report and Recommendation omits so much evidence that Mr. Reyes contends is material to his claims, he provides a summary below.

A.    **Julian Reyes is a print and video journalist, homeless advocate, and vocal police critic.**

In April 2013, an APD officer shot Mr. Reyes's dog.  Doc. 47-1, Ex. 1 ¶ 4.  He sued the City *pro se* for killing his dog, this Court appointed counsel, and the City settled Mr. Reyes's claim.  *Id.* ¶ 5.  Mr. Reyes was traumatized by this killing and became an advocate for improved training to reduce APD officers' knee-jerk tendency to kill dogs.  *Id.* ¶ 5-6.[2]  Mr. Reyes is also an

---

[2] Mr. Reyes objects to the Report and Recommendation's failure to reference this undisputed evidence or recognize that Mr. Reyes's lawsuit against the City for police misconduct provided a reason for the City and APD officers to retaliate against him.

advocate for the homeless. Doc 47-1, Ex. 1 ¶ 7. He records APD officers' interactions, primarily in downtown and central Austin, with homeless individuals in an effort to keep APD publicly accountable. *Id.* He wears a clearly visible press badge issued by the *Challenger Street Newspaper*, which he joined about twelve years ago. *Id.* ¶ 2. His work has been published in the *Challenger* and he publishes video journalism on YouTube and Facebook. *Id.* ¶ 3.[3]

Mr. Reyes has been arrested over twenty times by APD while recording police or otherwise advocating for government accountability; *in each case*, the charges were no-billed, dismissed by the prosecuting officer, or Mr. Reyes was acquitted. Doc. 47-1, Ex. 1 at ¶ 8. Mr. Reyes has *never* been convicted on any of the charges brought against him by APD while engaged in First Amendment activity. *Id.* His arrests, however, have led to his hospitalization and PTSD. *Id.* at ¶¶ 8, 12.[4]

Mr. Reyes filed two federal civil rights lawsuits against the City prior to this one. *See* Doc. 19 at 3 & n.2. Mr. Reyes has submitted many complaints to the APD, the Office of Police Monitor/ Oversight, and the City about APD officers mistreating him and others. *Id.* at 10.[5]

---

[3] Mr. Reyes objects to the Report and Recommendation's failure to reference the undisputed evidence of Mr. Reyes's publications and its failure to acknowledge that his extensive publications and vociferous criticism of APD conduct support a reasonable inference that ADP officers knew he is a citizen journalist, know he records their activity for publication, and have a reason to retaliate against him for exercising his First Amendment rights.

[4] Mr. Reyes objects to the Report and Recommendation's failure to reference this extraordinary string of failed charges, except to briefly note two instances described in Mr. Reyes's pleading. Doc. 56 at 2. Mr. Reyes objects to the Report and Recommendation's failure to recognize that such an extended string of dismissed charges raises a reasonable inference that the arrests lacked probable cause or were illegally made in retaliation for Mr. Reyes's exercise of his constitutional rights.

[5] Mr. Reyes objects to the Report and Recommendation's failure to reference this evidence and its failure to recognize that Mr. Reyes's repeated lawsuits against the City for police misconduct support an inference that his repeated arrests on charges that are consistently dismissed supports an inference of no probable cause or of retaliation.

**B.**     **The City, knowing Mr. Reyes is a citizen journalist, has branded him an "anti-police activist," "loony," and "turd" since he monitors and criticizes the police.**

Beginning as early as February 2017, APD branded Mr. Reyes an "anti-police activist." The City's 30(b)(6) witness, *see* Doc 47-1, Ex. 7, admitted that it is "[k]nown by officers" that Mr. Reyes is supposedly "anti-police," and suggested that the City gave Mr. Reyes the "anti-police activist" designation because "he films and follows officers and all law enforcement" and publishes videos and posts online.  *See* Doc. 47-1, Ex. 8 at 63:25-66:10.[6]

The City's files are filled with communications denigrating Mr. Reyes based on the content of his speech.  For example, as early as February 16, 2017, a police report noted that he "is listed as CAUTION/ANTI-POLICE activist" in police records.  Doc. 47-1, Ex. 2.  *See also* Doc. 47-1, Ex. 3 at 2 (calling Mr. Reyes "a known Anti-Police subject" and noting that he complained that an APD officer obstructed his filming police activity "from the sidewalk" at "a distance"); Ex. 4 (calling Mr. Reyes "a known anti police advocate"); Ex. 5 (calling Mr. Reyes "a known anti-police activist"); Ex. 6 ("Reyes is known as an anti-police activist and self-styled citizen journalist" who "has associated with anti-police organization [sic] 'Peaceful Streets Project'").[7]

The City's electronic database, accessible by all APD personnel, lists Mr. Reyes's employer as the *Challenger Street Newspaper*, so the City *knows* he is a journalist.  Doc. 47-1, Ex. 9.  Mr. Reyes's police profile states in all caps that he is an "ANTI-POLICE ACTIVIST."  *Id*. When anyone enters Mr. Reyes's name into APD's system, it will display this information:

---

[6] Mr. Reyes objects to the Report and Recommendation's failure to acknowledge this evidence or recognize that it supports an inference that the City and police are targeting and retaliating against him for his supposedly anti-police speech and viewpoint.

[7] Mr. Reyes objects to the Report and Recommendation's failure to acknowledge this evidence or recognize that it supports an inference that the City and police are targeting and retaliating against him for his supposedly anti-police speech and viewpoint.

| PERSON PARTICULARS | | | |
|---|---|---|---|
| Place Of Birth | TEXAS | | |
| Occupation | LANDSCAPING | | |
| Employer | CHALLENGER STREET NEWSPAPER | | |
| Citizenship | AMERICAN | | |
| Ethnicity | NON-HISPANIC | | |
| Language(s) Spoken | ENGLISH | | |
| Height | 5'08 | Weight | 200 LBS. |
| Build | FAT | Complexion | MEDIUM |
| Eye Color | BROWN | | |
| Hair Color | BROWN | Hair Style | UNKEPT / SHAGGY |
| Additional Remarks | ANTI-POLICE ACTIVIST | | |

Doc. 47-1, Ex. 9 at 5; *see also* Doc. 47-1, Ex. 10 (containing multiple reports identifying Mr. Reyes as employed by the *Challenger Street Newspaper* and as an "ANTI-POLICE ACTIVIST").[8]

The City's Rule 30(b)(6) witness admitted that this profile, which identifies Mr. Reyes as a journalist and labels him as ANTI-POLICE is seen by City officers, detectives and supervisors. Doc. 47-1, Ex. 8 at 71:4-24. He admitted that the City labelled Mr. Reyes a "ANTI-POLICE ACTIVIST" for "informational" purposes, "[s]o when officers encounter Mr. Reyes, they have an understanding of … his stance in regards with law enforcement." *Id*. at 71:4-10. That is, the City has singled Mr. Reyes out based on his speech and viewpoint. APD officers notify each other of Mr. Reyes's presence, using the "Anti Police Activist" label. For instance, on January 5, 2023, all APD Region 4 Supervisors were notified that "Julian Reyes 05/31/68 W/m, Anti Police Activist, has shown up again in DAVID sector," "filming officers and an ME crew," even though Mr. Reyes was simply exercising a clearly established First Amendment right. *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) ("[A] First Amendment right to record the police does exist, subject only

---

[8] Mr. Reyes objects to the Report and Recommendation's failure to acknowledge this evidence or recognize that it supports an inference that Mr. Reyes's speech and viewpoints are widely known at APD and that the City and APD are targeting and retaliating against him for his supposedly anti-police speech and viewpoint.

to reasonable time, place, and manner restrictions.").[9]

A February 2020 email chain epitomizes the City's knowledge of Mr. Reyes's First Amendment activities. An APD Crime/Intelligence Analyst emailed an e-zine published by "Stop the Sweeps" to another analyst and to others, stating that the publication was "most likely" "penned by Julian Reyes." Doc. 47-1, Ex. 12 at 2. The analyst claimed Mr. Reyes was "bashing" the City, calling APD Officer Yarger "a 'bully' who 'escalates confrontations,'" and complaining about "[a]dditional anti-police sentiment is expressed on Pages 22-23." *Id*. This email – targeting Mr. Reyes based on the content of his speech – was forwarded to an APD Commander and others, and a Seargent then forwarded the e-zine to eleven more APD officers while calling Mr. Reyes a "loon[y]" and a "turd:"

> FYI, everyone pay attention to these loonies. Don't cut them any room while dealing with them. Every time we are weak (the Reyes incident downtown) these turds get a little more brave.

Doc. 47-1, Ex. 12 at 1. The summary judgment record contains clear evidence of an APD supervisor directing officers to consider Mr. Reyes like excrement based on his speech; there is no evidence that this direction was ever countermanded or did not represent, in reality, the City's true policy and practice and reflected APD's singular focus on Mr. Reyes's vocal criticism of APD. The Report and Recommendation simply ignores this clear evidence of APD antipathy towards Mr. Reyes and those who would criticize APD's conduct.[10]

---

[9] Mr. Reyes objects to the Report and Recommendation's failure to acknowledge this evidence and the "turd" email, and the failure to recognize that it supports an inference that Mr. Reyes's speech and viewpoints are widely known at APD and the City and that APD officers are targeting and retaliating against him for his supposedly anti-police speech and viewpoint. This omission is particularly glaring given the Report and Recommendation's focus on Mr. Reyes's use of (constitutionally protected) profanity.

[10] Mr. Reyes objects to the Report and Recommendation for ignoring this direct proof, from City documents, that Mr. Reyes is known to APD for his speech and viewpoints and is disliked and disrespected because of them. Mr. Reyes objects to the Report and Recommendation's failure to

IV.   **Mr. Reyes objects to the Report and Recommendation because multiple contested issues of fact preclude summary judgment on his First Amendment claims.**

A.   **There are contested issues of fact as to whether probable cause supported Mr. Reyes's arrests and is ample evidence to support an inference that, even if there was probable cause, Mr. Reyes's arrests were in retaliation for the exercise of his First Amendment rights.**

**January 4, 2019, arrest.**   On January 4, 2019, Mr. Reyes was filming APD officers clearing homeless people from the sidewalk.  Doc. 47-1, Ex. 13A.  He recorded the group objecting to the officers' conduct.  *Id.*  Mr. Reyes began expressing his own views.  *Id.*  An officer told Mr. Reyes to step onto the curb, which he did.  *Id.* at 00:04:20.  Mr. Reyes sat down on the sidewalk, further away from the officer, *id.* at 00:05:35, but then a different officer ordered Mr. Reyes to stand up, move, or leave the scene, even though he posed no threat to anyone's safety and was not interfering with the officers' ability to write citations.  *Id.* at 00:06:35.  This officer claimed Mr. Reyes riled up the group, but the video and Mr. Reyes's affidavit contradict this, showing that they had been "riled up" before Mr. Reyes arrived by the police.  *Id.* at 00:07:10.  Nonetheless, Mr. Reyes was arrested, *id.* at 00:07:18, for "interfering with public duties," Doc. 47-1, Ex. 13B, even though Mr. Reyes was not obstructing any officer, but merely verbally criticizing their conduct.  The City seized Mr. Reyes camera and cell phone.  *Id.* at 7.  The Travis County Attorney's Office dismissed the charges.  Doc. 47-1, Ex. 13C.

It is well established that verbally criticizing police conduct is not probable cause to arrest for interference with public duties, under both Texas law and the First Amendment.  Tex. Penal Code § 38.15(d) (providing defense to offense of "Interference with Public Duties" if "the interruption, disruption, impediment, or interference consisted of speech only."); *Freeman v. Gore*,

---

recognize that this evidence from the City's own files provide strong support for an inference that APD has targeted Mr. Reyes based on his speech, not on his conduct.

483 F.3d 404, 414 (5th Cir. 2007) ("yelling" and "screaming" at a police officer does not constitute probable cause to arrest for interference with public duties); *City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("Second, contrary to the city's contention, the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."); *Pulliam v. Fort Bend Cnty, Tex.*, No. 4:22-CV-04210, 2024 WL 4068767, at * (S.D. Tex. Sept. 5, 2024) ("Cases where courts find probable cause for interference-with-public-duties arrests usually involve some sort of physical obstruction by the arrestee.").[11]  The Report and Recommendation credits, as true and uncontested, the APD report's account of this arrest.  Doc. 56 at 9-10.  While the Report and Recommendation acknowledges that Mr. Reyes was told he was "interfering with police duties" simply because he was objecting to the police conduct, *id.* at 10, it fails to recognize that this was an incorrect statement of the law or that that Mr. Reyes's speech was constitutionally protected and could not form the basis for an arrest for "interfering with public duties."  *Freeman*, 483 F.3d at 414.  That is, even if there was "probable cause" under Texas law for Mr. Reyes's arrest based on his critical speech, that arrest was illegal.

There is, therefore, summary evidence (even if contested) that Mr. Reyes's arrest was unconstitutional and based on his speech and criticism of the police, not conduct that interfered with the officers' ability to issue citations.  APD cannot bootstrap itself into probable cause for an arrest by giving a citizen an unlawful order and then arresting them for failing to comply.

---

[11]  APD General Order 302, entitled "Public Recording of Official Acts," provides that "[a] person's recording of officer's activity from a safe distance, and **absent any attendant action that obstructs the activity or threatens the safety of the officers, does not constitute interference.**" Doc. 47-1, Ex. 21 (emphasis added).  The order recognizes that "[a] person has the right to express criticism of the police activity being observed," and that criticism does not constitute interference if it does not jeopardize the safety of others and "does not violate the law or incite others to violate the law."  *Id.*  The summary judgment evidence shows, however, that the APD has an unwritten policy of ignoring General Order 302 as to Mr. Reyes, and instead discriminates and retaliates against him because he is a known, vocal critic of the City's homeless policy and policing.

Therefore, even without showing that Mr. Reyes was treated differently than others on January 4, 2019, there is evidence that this arrest violated Mr. Reyes's First Amendment rights.

**November 5, 2019.**  On November 5, 2019, Mr. Reyes was arrested while filming police for allegedly violating a City camping ordinance.  Doc. 47-1, Ex. 14A.  Although others were present filming the police, only Mr. Reyes was arrested.  *Id.*, Ex. 14B.  The police report shows that the officers knew Mr. Reyes is "a local activist who frequently follows police officer [sic] around documenting their actions and placing them on the internet for view," *id.*, Ex. 14A at 10, calling him as "a self proclaimed member of the press and a local activist."  *Id.* at 15.  During the arrest, APD Corporal Carlisle told Mr. Reyes he was being arrested for "your political views and beliefs."  Doc. 47-1, Ex. 1 ¶ 8(d).  Afterwards, Lt. Christopher Gwaldo emailed the group "APD DTAC Supervisors" that Mr. Reyes had been arrested, unlike other "protestors present filming." Doc. 47-1, Ex. 14B.  That email was forwarded to eleven more individuals, reinforcing APD's knowledge that Mr. Reyes films and publishes police activities in Austin.  Doc. 47-1, Ex. 14C.

The Report and Recommendation, while recognizing that "others were also filming police" who were not arrested, concludes that this proves Mr. Reyes was not "singled out because he was filming."  Doc. 56 at 12.  This conclusion ignores Mr. Reyes's claim that *he personally* has been singled out by the City over twenty times for disparate treatment because the City has labeled him an "anti-police activist" who criticizes police conduct.  The fact that Mr. Reyes alone was arrested *supports*, rather than refutes, his claim of retaliatory arrest.  Such retaliation is actionable, even when an arrest is supported by probable cause, and even when it is a single arrest, if motivated by policy.  *Lozman v. City of Riviera Beach*, 585 U.S. 87, 100-01 (2018).  There is summary judgment evidence, therefore, that this arrest violated Mr. Reyes' First Amendment rights.

**June 20, 2020.**  On June 20, 2020, Mr. Reyes was filming, from a safe distance, EMS personnel forcibly strapping a person in distress onto a stretcher on Sixth Street.  *See* Doc. 47-1, Ex. 15A at 00:17:15.  Mr. Reyes knew the woman and knew she did not like being restrained.  *Id.*, Ex. 1 at ¶ 8.  When a pedestrian intentionally blocked Mr. Reyes's view, Mr. Reyes flicked the man's hat off in frustration.  *Id.* at 00:17:30.  A second pedestrian then knocked Mr. Reyes's camera out of his hands and into the street.  *Id.* at 00:17:35.  Rather than respond to this assault on Mr. Reyes, an APD officer approached only Mr. Reyes, pushing him toward a wall and demanding that Mr. Reyes stand back, even though he was not interfering with the police or EMS.  *Id.* at 00:17:40; Ex. 15B at 00:18:00.  Mr. Reyes took out another camera to record the officer's conduct, but the officer continued to push him.  *See id*, Ex. 15B at 00:18:06.  After several shoves, Mr. Reyes's hand instinctively slapped the officer's arm away.  *Id.*  After goading Mr. Reyes into that reaction, the officer then arrested him.  *Id.*

The Report and Recommendation's description of the video of Mr. Reyes' arrest, at the very least, is debatable.  The description omits the fact that the officer shoved Mr. Reyes multiple times, without apparent justification.  *See* Doc. 47-1, Ex. 15B at 00:18:04-50.  It states that "Reyes does not comply with Larned's instructions and tries to leave," Doc. 56 at 12-13, but the video does not appear to support this claim; Mr. Reyes made no apparent motion to leave; he held his camera to film and continued to explain to the officer that he was the victim of an assault until he was shoved again, reacted, and was arrested.  *See* Doc. 47-1, Ex. 15B.

Here, too, even if there was probable cause to arrest, the Report and Recommendation sidesteps the illegality of a *retaliatory* arrest by defining the relevant group of similarly situated individuals at too high a level of generality.  There were two, non-restrained citizens on the scene – one with a camera and one without.  Notably, the man without the camera assaulted Mr. Reyes

by knocking the camera out of his hand was not arrested. APD attempted to excuse this differential treatment on the nonsensical claim that he was "acting in the defense of another." Doc. 47-1, Ex. 15C at 12. Knocking a person's camera into the street is not "legitimate defense of another." This transparently false post-hoc excuse for treating a person who hindered Mr. Reyes's effort to film police conduct more favorably supports the inference that the City was discriminating and retaliating against Mr. Reyes for his First Amendment-protected activity. As with every arrest at issue in this case, the charges against Mr. Reyes were dropped once they reached an unbiased party. Doc. 47-1, Ex. 15D, Ex. 15E.

Although video evidence can be useful, its value is limited. It should not be relied upon to grant summary judgment and deprive a plaintiff of his day in court if "one party's version of evidence does not 'blatantly contradict' the recording." *Kost*, 458 F. Supp. 3d at 582 (quoting *Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013)). This is particularly true where there are *hours* of video evidence subject to different interpretations, as here, rather than a short clip showing whether a stoplight was red or green. The video evidence, at a minimum, does not disprove Mr. Reyes's version, and thus does not support summary judgment.

**July 22, 2020.** On July 22, 2020, Mr. Reyes was arrested while filming City personnel conducting a homeless camp sweep, on public property from a safe distance, and without interfering with their actions. *See* Doc. 47-1, Ex. 16B at 00:01:55. A City employee and APD officers approached Mr. Reyes and demanded that he move further away. *Id*. at 00:03:20. Mr. Reyes defended his right to film where he was, but he did obey the unlawful order. Doc. 47-1, Ex. 16A at 00:03:20; Ex. 16B at 00:08:35. APD officers arrested Mr. Reyes, anyway, for "interference with public duties," although the video evidence shows he was not interfering with

the officers in any way, other than filming from a safe distance and defending his right to do so. Doc. 47-1, Ex. 16A at 00:03:35; Ex. 16B at 00:08:48.

Despite the governing legal standard about drawing all reasonable inferences against the non-movant, the Report and Recommendation credits the APD's version of events and seems improperly concerned about the language Mr. Reyes used to defend his rights. Doc. 56 at 13-14. The Report and Recommendation does not identify any evidence, let alone uncontradicted proof, that Mr. Reyes was "interfering" with any APD officer's duties, other than not complying (fast enough) with their demand that he follow their arbitrary command to "move away." *Id.* The fact that others filming might have obeyed a police command is no evidence that Mr. Reyes committed an offense, let alone uncontested evidence that he interfered with police duties. As with each prior arrest, the charges against Mr. Reyes were dismissed. Doc., Ex. 16C.

There is a fact issue as to whether there was probable cause to arrest Mr. Reyes for "interference with public duties" on July 22, 2020, and even if there was probable cause, the APD's treatment of Mr. Reyes previously and that day supports a reasonable inference that his arrest was in retaliation for his speech, viewpoint, and filming police in violation of the First Amendment.

**December 23, 2023.** On December 23, 2023, Mr. Reyes was filming, from a considerable distance and without interfering, ADP officers who had two individuals handcuffed against a patrol car. Doc. 47-1, Ex. 18A at 00:00:24. Two pedestrians are clearly seen walking directly past the police and the two handcuffed individuals, much closer than Mr. Reyes, without being confronted by the police in any way. *Id.* at 00:00:43. Mr. Reyes asked an officer near him whether he could use the sidewalk as those other people were doing, but was told he could not, without reason. *Id.* at 00:01:05. After the police placed the two suspects in a patrol car, another couple walked past the police vehicles, again quite close, and again without any interference by APD. *Id.* at 00:01:10.

Only Mr. Reyes and his companion, who was also filming, were prevented from getting any nearer to the police vehicles.  *Id.*

After the suspects were in the patrol car, Officer Yarger inserted himself into the situation. Officer Yarger had received Sgt. Breckenridge's email calling Mr. Reyes a "turd" and urging officers not to be "weak" when dealing with him.  Doc. 47-1, Ex. 12.  Officer Yarger had been identified by name in the "Stop the Sweeps" publication, which had warned that he was a bully who escalated situations.  *Id.* at 10.  Officer Yarger has received oral and written reprimands, including a reprimand for being rude and failing to maintain an impartial attitude, and has been suspended for misconduct.  Doc. 47-1, Ex. 20 at 18:3-20:13.

For no apparent reason, Officer Yarger charged at Mr. Reyes, yelling at him to move further away, despite the suspects already being in the patrol car and other individuals having been permitted to get much closer to the police.  Doc. 47-1, Ex. 18A at 00:001:35.  The City admits it is not lawful to demand that a citizen move off a public sidewalk that is not within a crime scene or work zone.  Doc. 47-1, Ex. 8 at 101:19-22.  Nevertheless, Officer Yarger gave Mr. Reyes a single instruction to back up, and while Mr. Reyes was doing so, but apparently not fast enough for Officer Yarger, Officer Yarger violently seized Mr. Reyes and arrested him.  Doc. 47-1, Ex. 18A at 00:001:35.

Again, the Report and Recommendation credits the City's version of events and ignores contradictory evidence and reasonable interpretations of the evidence.  The Report and Recommendation states that Mr. Reyes was arrested "for interfering with a police investigation and public duties," that "he attempted to interfere with a police investigation and willfully violated police orders," and that he was in a "crime scene."  Doc. 56 at 15.  Respectfully, the evidence simply does not support these conclusions, and certainly does not establish them conclusively.

There is no evidence the location was a "crime scene." There was no police tape or police cordon, just two individuals handcuffed against a police car for reasons that do not appear in the record. There is no evidence that any crime had taken place in the location. Moreover, other citizens were allowed to walk directly past the suspects – much closer than Mr. Reyes ever approached – without police interference. At the time Mr. Reyes was arrested, the suspects were contained within a patrol car. While the Report and Recommendation states that "[t]he video shows no other pedestrians failing to comply with police orders to move away from a crime scene [sic]," Doc. 56 at 15, *no other pedestrians were ordered to do so*, even those who approached the arrestees directly and passed by them within a few feet. There is substantial evidence that Mr. Reyes was not interfering with police duties and that he was arrested by an APD officer with a disciplinary history who had been instructed by a superior not to be "weak" when dealing with this "turd." This evidence supports a reasonable inference that Mr. Reyes was singled out for disparate treatment because of his perceived anti-police viewpoint and First Amendment activity of filming the police. A reasonable factfinder could conclude that Officer Yarger was targeting Mr. Reyes specifically, as he required things of Mr. Reyes that he required of no one else and gave him no reasonable opportunity to comply with an improper order before arresting him.

**March 8, 2024.** As a final example, on March 8, 2024, Mr. Reyes was filming a small protest in Downtown Austin when he saw Jeff Zavala, another citizen journalist, being arrested by APD officers. Doc. 47-1, Ex. 19A at 00:05:30. As the officers took Mr. Zavala to a City vehicle, Mr. Reyes asked why he was being arrested. *Id.* at 00:06:50. As Mr. Reyes filmed his co-journalist's arrest, police officers used their bicycles as a barricade between the sidewalk and street. *Id.* at 00:07:40. Officers had also blocked the lane of traffic closest to the sidewalk. *Id.* at 00:08:00. Mr. Reyes walked closer to the bicycle barricade to get a better view, criticizing the officers'

actions; he did not cross the barricade or interfere with them. *Id.* at 00:08:50. Despite posing no threat to anyone's safety, police officers demanded Mr. Reyes move back to the sidewalk. *Id.* Mr. Reyes obliged. *Id.* at 00:09:13; Doc. 47-1, Ex. 19B at 00:06:41. Nonetheless, an APD Lieutenant commanded his officers, "Grab Julian; he's going to jail," Doc. 47-1, Ex. 19C at 00:19:10, again reflecting ADP's knowledge of Mr. Reyes. Mr. Reyes was arrested "for Pedestrian on a roadway," although the roadway was closed where Mr. Reyes had stood, and although Mr. Reyes had returned to the sidewalk as directed, which is clearly shown on an officer's body cam. Doc. 47-1, Ex. 19B at 00:06:57.

The Report and Recommendation inaccurately states that Mr. Reyes was arrested "for blocking a hotel driveway," Doc. 56 at 16, contrary to the police report. The Report and Recommendation cites "Dkt. 37" to support this assertion, *id.*, but that document is the Agreed Motion for Entry of Scheduling Order Deadlines, which does not refer to this arrest. *See* Doc. 37. The Report and Recommendation also states that Mr. Reyes was arrested because he "failed to comply" with the officer's orders, Doc. 56 at 16, when the video shows that he *did* comply by moving from the roadway to the sidewalk, and that he was arrested while *on the sidewalk*. Doc. 47-1, Ex. 19A at 00:9:31; Ex. 19B at 06:30. Another person who was behind Mr. Reyes filming from the hotel driveway in a business suit was not arrested. *Id.*

Mr. Reyes objects to the Report and Recommendation's conclusion that the evidence is undisputed that there was probable cause for his arrest. The summary judgment evidence, like that of his prior arrests, supports a conclusion that APD officers know who Mr. Reyes is (he was addressed by his first name) and knew that he was filming police as a journalist, a fact contained in the APD database. The fact that "a woman also was arrested while standing in the driveway but not filming" does not conclusively prove that Mr. Reyes was not singled out, as the Report and

Recommendation suggests, Doc. 56 at 16, because Mr. Reyes was arrested while on the sidewalk after complying with the officer's order, not on the driveway.

> **B.    There is summary judgment evidence supporting an inference that the City has a pattern or practice of violating Mr. Reyes's First Amendment rights and retaliating against him for exercising them.**

Section 1983 provides a right of action against municipalities for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  The Fifth Circuit has held unequivocally that "First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions."  *Turner*, 848 F.3d at 688.  "Filming the police contributes to the public's ability to hold the police accountable, ensure that police officers are not abusing their power, and make informed decisions about police policy."  *Id.* at 689.

> Gathering information about government officials in a form that can be readily disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.' … This is particularly true of law enforcement officials, who are granted substantial discretion that may be misused to deprive individuals of their liberties.  Ensuring the public's right to gather information about their officials not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally.

*Id.* at 689-90 (quoting *Glik v. Cunniffe*, 655 F.3d 78, 82-83 (1st Cir. 2011) (citations omitted)).

A municipality is liable under Section 1983 when (1) an official policy or practice; (2) promulgated or knowingly tolerated by a municipal policymaker; (3) was the moving force behind the violation of the plaintiff's constitutional rights.  *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019).

An official policy need not be written; it may constitute "a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."

*Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018). "That is, the existence of a persistent pattern of illegal conduct, tolerated by municipal policy makers, tends to show that the subject conduct … represents the realization of an unlawful policy." *Milam v. City of San Antonio*, 113 F. App'x. 622, 625 (5th Cir. 2004)).

> [T]he failure to take disciplinary action in response to an illegal arrest, when combined with other evidence, could tend to support an inference that there was a preexisting de facto policy of making illegal arrests:  the policymaker did not discipline the employee because, in the policymakers' eyes, the employee's illegal conduct actually conformed with municipal policy.

*Id*.  The City acknowledged that there was no discipline or training of police officers and no changes in APD policy.  Doc. 47-1, Ex. 8 at 88:10-15, 89:11-22; 90:12–23; 95:21–96:5, 102:12–103:9.

The summary judgment evidence is more than sufficient to support a finding that the City's repeated arrests of Mr. Reyes reflect an unwritten policy to prevent, disrupt, or retaliate against Mr. Reyes's exercise of his First Amendment rights.

### 1.    The City confirmed that APD's arrests of Julian Reyes while filming police activities are fully consistent with its policy.

The City produced a Rule 30(b)(6) witness, Assistant Chief Eric Miesse, to testify as to (1) the City's policy and practice regarding arrests of individuals filming police activity; (2) whether APD's arrests of Mr. Reyes were consistent with the City's policy and practice; and (3) whether any officer received any correction or discipline due to the nature of Mr. Reyes's arrests.  Doc. 47-1, Ex. 7.  Assistant Chief Miesse testified that he read the arrest reports and watched the available video(s) for every arrest from January 2019 to January 2024.  Doc. 47-1, Ex. 8 at 85:13-22.  He then testified, on the City's behalf, that each arrest was pursuant to City policy.  *Id.* at 86:1-2; 88:6-9; 89:8-10; 90:9-11; 95:18-20; 102:9-11.  He confirmed that the City

did not discipline or re-train any of the involved officers and made no changes in APD policy as a result. *Id.* at 88:10-15; 89:11-22; 90:12-23; 95:21-96:5; 102:12-103:9.

> **2.      Probable cause does not defeat Julian Reyes's claims, and even if it did, there are fact issues as to whether the City had probable cause to arrest him.**

It is uncontested that the City's charges against Mr. Reyes are routinely dismissed, and that every arrest of Mr. Reyes while filming police resulted in a no-bill, dismissal, or acquittal. While probable cause may defeat a one-off First Amendment claim against an individual officer, *see Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), probable cause does *not* defeat a First Amendment claim against a municipality for a pattern of discriminatory and retaliatory arrests. *Lozman*, 585 U.S. at 100. "[W]hen retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Id.* at 100-01. Where "a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," probable cause becomes immaterial. *Buehler v. Dear*, 27 F.4th 969, 993-94 (5th Cir. 2022). Recently, the Supreme Court clarified that the *Nieves* exception does not "demand for virtually identical and identifiable comparators." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).

There is ample summary judgment evidence that APD is retaliating against Mr. Reyes. As noted above, Mr. Reyes was repeatedly arrested while filming police even though others who were filming but not considered "turds" by the APD, or who were not filming, were left alone:

- On November 5, 2019, officers only arrested Mr. Reyes despite other individuals present filming the event;

- On June 20, 2020, APD officers arrested Mr. Reyes for assault, but let the man who knocked Mr. Reyes's camera out of his hands walk away;

- On December 23, 2023, Officer Yarger arrested Mr. Reyes but let others who were not filming approach the "crime scene" much more closely without ordering them to move; and

- On March 8, 2024, officers arrested Mr. Reyes for blocking a driveway despite him obeying an order to return to the sidewalk.

Moreover, the City's probable cause to arrest Mr. Reyes is in dispute. While the dismissal of any single charge may not show the lack of probable cause, the routine dismissal of charges lodged against Mr. Reyes calls into question the City's practice of routinely arresting him while filming police and supports a reasonable inference, and thus a fact issue, that Mr. Reyes has been subject to arbitrary arrests while filming or criticizing the police based on his speech and viewpoint, not conduct.[12]

> ### 3. There is ample evidence that the City has singled Julian Reyes out for discrimination and retaliation for exercising his First Amendment rights.

Mr. Reyes objects to the Report and Recommendation because it overlooks substantial summary judgment evidence that APD, with the City's approval and ratification, targeted Mr. Reyes because of his speech critical of APD. APD has officially and continuously labeled Mr. Reyes as an anti-police activist based on his viewpoint. *See* Doc. 47-1, Ex. 8 at 63:25-64:10; Ex. 9 at 5; Ex. 10.

This is viewpoint discrimination: the City does not label "pro-police activists." Doc. 47-1, Ex. 8 at 76:3-6. Viewpoint discrimination is "an egregious form of content discrimination."

---

[12] Although *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979), notes that a suspect's later acquittal does not mean there was no probable cause for their arrest, *DeFillippo* does not address the question presented here, which is whether the repeated dismissal of charges before trial supports an inference that the arrests lacked probable cause or were made pursuant to a constitutionally impermissible policy or practice.

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).  The City has encouraged its officers to commit viewpoint discrimination by labelling Mr. Reyes according to his expressed opinions about APD.  There is substantial summary judgment evidence that the City treats Mr. Reyes differently than other citizens, whether they are filming or not.  Doc. 47-1, Ex. 14B (noting Mr. Reyes was the only person arrested, despite other protesters filming); Doc. 47-1, Ex. 15C at 12 (declining to arrest the person who knocked away Mr. Reyes's camera); Doc. 47-1, Ex. 16A (arresting only Mr. Reyes, despite another individual filming).  APD has singled out Mr. Reyes based on his speech since at least 2017.  Doc. 47-1, Ex. 3 at 2; Ex. 4; Ex. 5; Ex. 6; Ex. 14A at 10.  Mr. Reyes objects to the Report and Recommendation because it fails to recognize the substantial summary judgment evidence supporting Mr. Reyes's claim of discriminatory and retaliatory treatment by ADP due to his speech.

## V.    Mr. Reyes objects to the Report and Recommendation's conclusion that he submitted "no evidence" that the City violated the Privacy Protection Act.

### 1.    The Privacy Protection Act.

In 1979, the Supreme Court held that reporters have no First Amendment right to be free from searches and seizures of "evidence" they may have gathered while newsgathering.  *Zurcher v. Stanford Daily*, 436 U.S. 547 (1979).  In response, Congress enacted the Privacy Protection Act of 1980 ("the PPA"), which prohibits federal and state governments, except in narrow circumstances, from seizing publishers' work product and documentary materials – with or without a search warrant.  42 U.S.C. § 2000aa.  Congress provided a civil remedy for those aggrieved by a search or seizure in violation of the PPA.  42 U.S.C. § 2000aa-6(a)(1); (f).  Governmental units may not assert the purported immunity or good faith of the officer who conducted the search and seizure.  42 U.S.C. § 2000aa-6(c).  *See Binion v. City of St. Paul*, 788 F. Supp. 2d 935, 948 (D.

Minn. 2011) (fact issues precluded summary judgment on PPA claim against City, which lacked immunity for illegal seizure of internet journalist's videos).

The PPA prohibits "a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or similar form of public communication … ."  42 U.S.C. § 2000aa(a).  "Work product materials" include materials "prepared, produced, authored, or created" "in anticipation of communicating such materials to the public" that are possessed for that purpose and include "mental impressions, conclusions, opinions, or theories" of the person who prepared them. 42 U.S.C. § 2000aa-7(b).

The PPA also prohibits officers from searching or seizing "documentary materials," which include "written or printed materials, photographs, motion picture films, negatives, video tapes, audio tapes, and other mechanically, magnetically or electronically recorded cards, tapes, or discs … ."  42 U.S.C. § 2000aa(b); § 2000aa-7(a).

"Work product" and "documentary materials" may be searched for or seized if "there is probable cause to believe that the person possessing such materials has committed or is committing the criminal offense to which the materials relate," but not when "the offense to which the materials relate consists of the receipt, possession, communication, or withholding of such materials or the information contained therein … ."  42 U.S.C. § 2000aa(a)(1); (b)(1).[13]

---

[13] The other exceptions are not relevant here:  national defense, classified information, restricted data, child pornography, child sex trafficking, to prevent death or serious bodily injury, to prevent destruction, alteration, or concealment, or after a court order produced in response to a subpoena has been defied.  *See* 42 U.S.C. § 2000aa(a)(1)(2); (b)(1)-(4).

**2.    The Report and Recommendation fails to recognize contested issues of fact that preclude summary judgment on Mr. Reyes's Privacy Protection Act claims.**

The City's motion addressed only the October 24, 2021, seizure of Mr. Reyes's journalistic materials.  Doc. 44 at 18-19.  The City ignored its seizure of Mr. Reyes's cameras and materials conducted on January 4, 2019.  *See* Doc. 47-1, Ex. 13B at 7.  Because the City's motion did not address the second seizure, Mr. Reyes did not address it in his response.  Yet, the Report and Recommendation concluded Mr. Reyes waived his claim as to the second seizure.  The Report and Recommendation should not have recommended the grant of summary judgment as to the January 4, 2019 seizure because the Court did not give Mr. Reyes notice that it would rule on this seizure *sua sponte*.  *See* Fed. R. Civ. P. 56(f)(3) ("*After giving notice and a reasonable time to respond*, the court may: … consider summary judgment on its own a*fter identifying for the parties material facts that may not be genuinely in dispute*." (emphasis added)); *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1398 (5th Cir. 1994) ("[W]e have vacated summary judgments and remanded for further proceedings where the district court provided no notice prior to granting summary judgment *sua sponte*, even where 'summary judgment may have been proper on the merits.'" (quoting *Judgwin Props. Inc. v. U.S. Fire Ins. Co.*, 973 F.2d 432, 437 (5th Cir. 1992))).  In any case, the Report and Recommendation erroneously recommends dismissal of both claims.

First, the assertion that Mr. Reyes "did not identify himself as a member of the press," and did not "provide[] any evidence he had his cameras with him because he intended to record his activity and disseminate the material to the public," Doc. 44 at 18, Doc. 56 at 23, 25, ignores both the facts and the law.  Since 2017, the City had flagged Mr. Reyes as an "anti-police *activist*," indicating it knew he was engaging in constitutionally protected activities by criticizing police

conduct.  *E.g.*, Ex. 2.  The City knows he works for the *Challenger Street Newspaper*; it is in the City's profile of Mr. Reyes available to every APD officer.  In any case, the PPA is not limited to "the press;" it applies whenever a person is "reasonably believed" to "have a purpose to disseminate to the public" materials.  42 U.S.C. § 2000aa(a).  Steve Jackson Games was not "the press;" it published role playing game books, yet Judge Sparks correctly held that its work product materials were protected from seizure by the Secret Service, even pursuant to a search warrant. *Steve Jackson Games, Inc. v. U.S. Secret Service*, 816 F. Supp. 432, 437-38 (W.D. Tex. 1993). The City *admitted* that Mr. Reyes has "told officer that he was recording his [sic] activities."  Doc. 44 at 19.  *See Garcia v. Montgomery County, Md.*, 145 F. Supp. 3d 492, 524-25 (D. Maryland 2015) (denying summary judgment on PPA claim where journalist identified himself as a member of the press, "a self-identification that would support the reasonable belief that [he] intended to disseminate his recording to the public").  Therefore, the summary judgment record contains not only direct evidence that the City knew Mr. Reyes is a journalist who disseminates his film material online, but the evidence also raised a fact question whether a reasonable officer would believe so by the simple fact that Mr. Reyes was actively filming, let alone all the APD's accumulated and disseminated knowledge about Mr. Reyes's long-standing practice of filming police for publication and criticism.

Second, whether the City had probable cause to arrest Mr. Reyes is in dispute, as noted above.  It is also not dispositive, because the purported existence of probable cause to arrest Mr. Reyes did not provide the City justification to seize his journalistic materials.  Those materials did not relate to the purported offense – unless the City arrested Mr. Reyes *for* filming the police, and his recordings was evidence of *that* "offense."  If so, that would be admitting to a violation of the First Amendment.  *Turner*, 848 F.3d at 690.  In any case, the factual disputes in this case over

probable cause precludes summary judgment. *E.g.*, *Basler v. Barron*, No. H-15-2254, 2015 WL 477573, at *12 (S.D. Tex. Feb. 6, 2017) (PPA applies to arborist by profession who contributes to internet publications critical of police; denying summary judgment due to fact issue on probable cause for arrest); *Dunn v. City of Fort Valley*, 464 F. Supp. 3d 1347, 1369 (M.D. Ga. 2020) (citizen stated claim under PPA when he was arrested without probable cause while filming inside courthouse); *Madaio v. Roden*, No. CV-06-BE-0904-S, 2007 WL 9697592, at *4 (N.D. Ala. May 9, 2007) (denying summary judgment on PPA claim where probable cause and photographer's consent to search were in dispute).

Third, Mr. Reyes was not "recording his own actions," Doc. 44 at 19, he was recording ***the police officer's*** actions. He does not point the camera at himself; he records and publishes police conduct.

Because there are, at a minimum, fact issues as to whether the City's seizure of Mr. Reyes's work product and documentary materials violated the PPA, summary judgment should be denied.

## VI.    Conclusion and prayer.

For these reasons, Plaintiff Julian Reyes requests that the Court sustain his objections to the Report and Recommendation, deny the City of Austin's Motion for Summary Judgment, and grant such other and further relief to which he may be entitled.

[SIGNATURE BLOCK ON THE FOLLOWING PAGE]

Respectfully submitted,

By:    */s/ Peter D. Kennedy*
Peter D. Kennedy
State Bar No. 11296650
pkennedy@gdhm.com
Daniela Peinado Welsh
State Bar No. 24127300
dwelsh@gdhm.com
Mark A. Stahl
State Bar No. 24125420
mstahl@gdhm.com
Graves, Dougherty, Hearon & Moody, P.C.
401 Congress Avenue, Suite 2700
Austin, Texas 78701
(512) 480-5600 (Phone)
(512) 480-5822 (Fax)

**ATTORNEYS FOR PLAINTIFF
JULIAN REYES**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 10, 2024, I caused a copy of the forgoing document to be served

by the Electronic Case Filing System for the United States District Court for the Western District

of Texas on all parties registered or otherwise requesting electronic notice in this case.

*/s/ Peter D. Kennedy*
Peter D. Kennedy